# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>2011 silver Honda Accord (N.C. Registration Number Plate RET6873) )<br>)<br>)<br>)<br>)<br>) | Case No. 1:24mj3 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3

located in the _____ MIDDLE _____ District of _____ NORTH CAROLINA _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Section 841 | Distribution of Controlled Substances |
| 18 USC Sections 922g; 924(c) | Possession of Firearm by Felon; Possession of Firearm in Furtherance of Drug Trafficking |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ John McCann
*Applicant's signature*

John McCann, FBI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_telephone other email_ *(specify reliable electronic means)*.

Date: 01/05/24

_____
*Judge's signature*

City and state: Greensboro, NC

L. Patrick Auld, Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br>4511 LANGDON DRIVE, APARTMENT 203,<br>MORRISVILLE, NORTH CAROLINA, 27560;<br>4573 LANGDON DRIVE, UNIT C, MORRISVILLE,<br>NORTH CAROLINA, 27560;<br>2011 SILVER HONDA ACCORD;<br>2013 BLACK KIA SORENTO;<br>2016 BLACK MERCEDES BENZ S550; AND<br>2020 BLACK MERCEDES BENZ GLE 350 | Case No. 1:24mj3<br><br>**Filed Under Seal** |

AFFIDAVIT IN SUPPORT OF
SEARCH AND SEIZURE WARRANT

1.      I, Jonathan McCann, ("this affiant"), am a full time Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) and have been since 2019.  This affiant has been a sworn law enforcement officer since 2003 with the Raleigh Police Department (RPD) and I am currently assigned to the Career Criminal Unit (CCU). This affiant's assignments and experience include uniformed patrol and criminal investigations; to include drug related criminal activity, firearms violations, gang activity, person crimes, property crimes, and juvenile crimes. This affiant has received training through the RPD's Academy, and regularly scheduled in-service training sessions with RPD and the FBI.  I have attended gang and narcotics investigation classes within the RPD and advanced gang and narcotic investigation classes from sources outside of the RPD.  Through this affiant's training and experience, I am familiar with persons, practices, and with the appearance, packaging, manufacturing, sales, and distribution of illegal controlled substances. This affiant has been involved in numerous illegal weapons cases as well as controlled

1

substance investigations on both the federal and state levels. This affiant has testified in both state and federal criminal court proceedings. This affiant has experience in the management and interviewing of cooperating human sources (CHS).

2.      As a federal task force officer, this affiant is authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3.      This affidavit is submitted in support of an application for a warrant to search the following locations and vehicles associated with Frederick WIGGINS ("WIGGINS"):

a.) WIGGINS' residence located at 4511 Langdon Drive, Apartment 203, Morrisville, North Carolina 27560,[1] to include any storage sheds, or any other place within the apartment that can reasonably be used to stash or conceal illegal contraband or evidence ("SUBJECT PREMISES"), more particularly described in attachment A-1;

b.) WIGGINS' garage located at 4573 Langdon Drive, Unit C, Morrisville, North Carolina 27560 ("SUBJECT GARAGE"), more particularly described in attachment A-2;

c.) WIGGINS' primary vehicle, a silver in color 2011 Honda Accord with a Vehicle Identification Number ("VIN") 1HGCS2B85BA000709 and bearing

---

[1] While much of Morrisville falls in Wake County and the Eastern District of North Carolina, Agents have researched this specific address and determined that it falls in Durham County and the Middle District of North Carolina.

2

a North Carolina registration number plate of RET6873 ("SUBJECT VEHICLE 1"), more particularly described in attachment A-3;

d.) WIGGINS' secondary vehicle, a black in color, previously white, 2013 Kia Sorento with VIN 5XYKW4A23DG393958 and bearing a North Carolina registration number plate of HJL1547 ("SUBJECT VEHICLE 2"), more particularly described in attachment A-4,

e.) WIGGINS' third vehicle, a black in color 2016 Mercedes-Benz S550 with VIN WDDUG8CB7GA221405 and bearing a North Carolina registration number plate of KFX5908 ("SUBJECT VEHICLE 3"), more particularly described in attachment A-5,

f.) WIGGINS' fourth vehicle, a black in color 2020 Mercedes-Benz GLE 350 with VIN 4JGFB4KB6LA055718 and bearing a North Carolina registration number plate of KKY1033 ("SUBJECT VEHICLE 4"), more particularly described in attachment A-6.

4.      The information contained within this Affidavit is based on my training and experience, as well as information I have developed, and information relayed to me by other law enforcement officers.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), Title 18, United States Code, Section 922(g) (Possession of a Firearm by a Convicted Felon), Title 18, United States Code, Section 924(c)

3

(Possession of a Firearm in Furtherance of a Drug Trafficking Crime), all collectively referred to as the "TARGET OFFENSES," have been committed, are being committed, and will be committed by WIGGINS and others. There is also probable cause to search the locations described in **Attachments A-1, A-2, A-3, A-4, A-5,** and **A-6** for evidence of these crimes, as described in **Attachment B.**

      6.     Based upon my training and experience, I am familiar with the habits of, and terminology used by, those engaged in drug trafficking. I know the following regarding drug traffickers:

(a) Drug traffickers use various locations (to include but not limited to; apartments, single family residences, various outbuildings on residential properties) to serve different functions so that customers, thieves, and law enforcement personnel do not learn about any one location where large quantities of narcotics, money, and/or other drug-related assets are stored. These locations are commonly referred to as "stash" locations. Drug traffickers store narcotics, money, drug related assets, records, and other evidence of their drug trafficking across multiple different locations in order to safeguard their assets and avoid law enforcement detection. Drug traffickers also use multiple different locations and vehicles to meet with customers in an effort to avoid law enforcement detection.

(b) Persons involved in large-scale drug trafficking conceal, in various locations and vehicles, caches of drugs, drug paraphernalia, jewelry, automobiles, automobile titles, deeds to property, and other items of value and/or proceeds of

4

drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in narcotics trafficking activities.

(c) Drug traffickers maintain at multiple locations—including automobiles and the residences where they live—money, ledgers, narcotic supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed; that drug traffickers also maintain drug paraphernalia such as cutting materials, weighing devices, miscellaneous containers, and measuring devices which are used to facilitate the distribution of narcotics. Furthermore, I know that while narcotics may be removed quickly from what are known as "stash" locations, ledgers, drug paraphernalia, and other indicia related to the distribution and sales of narcotics often remain for longer periods of time as these are used to reference and/or to continue to facilitate the distribution of narcotics.

(d) When drug traffickers amass large quantities of cash from the sale of drugs, they often attempt to legitimize these profits using banks and financial institutions and the services these institutions provide, which include accounts, securities, travelers' checks, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, and safety deposit boxes.

(e) Drug traffickers often place assets in names of relatives and close friends to avoid detection of those assets by law enforcement agencies; and that even

5

though these assets are in other persons' names, the drug dealers retain records, documents, and deeds reflecting the purchase of those assets while continuing to use those assets and exercise dominion and control over them.

(f) Drug dealers use telephones, portable cellular telephones, pagers, and other communication devices and maintain telephone and address books, telephone bills and other books and papers which reflect names, addresses, and/or telephone numbers of their associates in the narcotic trafficking organization and customers of narcotics.

(g) Drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product; and that these traffickers usually maintain these photographs at their premises or on media storage devices.

(h) Drug dealers commonly have in their possessions, that is on their persons, at their residence and/or at their stash houses, firearms, including handguns, pistols, revolvers, rifles, shotguns and other weapons, that are used to protect and secure the drug trafficker's property and proceeds, including narcotics, narcotic paraphernalia, currency, jewelry, and records.

(i) It is common for traffickers to use cell phones, smart phones, and other telecommunication devices to conduct illegal transactions.

**Probable Cause**

7.    The United States, along with the FBI and RPD, are conducting a criminal investigation into a Drug Trafficking Organization ("DTO"), a wholly illegitimate criminal enterprise, operating in the Eastern and Middle Districts of

6

North Carolina. Because this affidavit is being submitted for the limited purpose of securing a warrant to search the SUBJECT PREMISES, SUBJECT GARAGE, and SUBJECT VEHICLES, I have set forth only those facts necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES will be located at and/or in the SUBJECT PREMISES, SUBJECT GARAGE, and SUBJECT VEHICLES.

<em>Relevant Background Information</em>

8.     **Frederick Wayne WIGGINS (WIGGINS)**, also known as "Fox," is the suspected leader of the DTO, which engages in armed drug trafficking and violent crimes in the Raleigh, North Carolina area. Investigating agents believe that WIGGINS is responsible for the acquisition and redistribution of kilograms of controlled substances, specifically cocaine. As explained herein, agents believe WIGGINS has used three prior telephones from June 2023 to October 2023. Agents believe that WIGGINS began using a fourth telephone number of 347-606-5422, hereafter referred to as TARGET TELEPHONE ONE ("TT1"), on approximately October 20, 2023.  On December 1, 2023, WIGGINS discontinued use of TT1 and transitioned to a fifth telephone number 914-760-2441, hereinafter referred to as TARGET TELEPHONE TWO ("TT2").

9.     WIGGINS is a convicted felon. WIGGINS' criminal history includes the following relevant North Carolina felony convictions: possession of cocaine (1990; 1992), possession with the intent to sell or deliver cocaine (1993; 1994; 1998; 2000; 2002). In October 2008, WIGGINS was found guilty in United States District Court,

7

Eastern District of North Carolina, of possession of a firearm by felon and possession of a firearm in furtherance of a drug trafficking crime. For this federal conviction, WIGGINS was sentenced to 120 months incarceration and 36 months of supervised release.

10.    The SUBJECT PREMISES at 4511 Langdon Dr, Apartment 203, Morrisville, NC 27560, is a single family, second story apartment, which is listed as a primary address with North Carolina Department of Motor Vehicle ("NCDMV") for both WIGGINS and his wife, Sheila WIGGINS (SHEILA). SUBJECT PREMISES is also listed as WIGGINS' address since November of 2022 in Accurint[2], a law enforcement database.   On October 30, 2023, at approximately 8:48 am, an investigating agent observed WIGGINS exit SUBJECT PREMISES. Electronic and physical surveillance demonstrates that WIGGINS spends nearly every night at the SUBJECT PREMISES and uses it as his primary residence.

11.    On the evening of November 28, 2023, investigating agents established physical surveillance of WIGGINS as he arrived at the SUBJECT PREMISES at approximately 5:00 PM, in SUBJECT VEHICLE 3.  After stopping briefly at the apartment complex office and dropping SHEILA off outside the SUBJECT PREMISES, WIGGINS drove to a nearby exterior outbuilding, where he parked SUBJECT VEHICLE 3, inside a single car garage labeled "C," the SUBJECT

---

[2] Accurint is an information database that aggregates public records to verify identities, conduct investigations, provide intelligence, and detect fraud. Based on your affiant's training and experience, Accurint is a reliable source for identifying phone numbers and addresses for individuals.

GARAGE. After parking SUBJECT VEHICLE 3 inside the SUBJECT GARAGE, WIGGINS closed the garage door and walked towards the SUBJECT PREMISES, which is within the same complex and less than 500 feet away.

12.    A check of North Carolina Department of Motor Vehicle (NCDMV) records shows that WIGGINS has an active operator's license with a listed home address matching the SUBJECT PREMISES. These same records show that SUBJECT VEHICLE 1; SUBJECT VEHICLE 2; SUBJECT VEHICLE 3; and SUBJECT VEHICLE 4 are all actively registered to WIGGINS.

*Investigation into WIGGINS*

13.    The FBI and RPD is conducting an ongoing criminal investigation into WIGGINS' drug distribution. The investigation began in February of 2023 and focused on WIGGINS and others who were distributing kilogram quantities of cocaine and cocaine base, along with marijuana and MDMA, in the Raleigh, North Carolina area.

14.    The investigation has shown that WIGGINS is a source of supply ("SOS") for kilogram quantities of controlled substances, including cocaine and cocaine base. The SUBJECT PREMISES, SUBJECT GARAGE, and SUBJECT VEHICLES are all used by WIGGINS in furtherance of his drug distribution.

15.    Information contained in this affidavit is supported by the overall investigation which includes but is not limited to the use of the following investigative techniques: confidential human source (CHS) cultivation and debriefs; physical surveillance; electronic surveillance to include the use of pen register/trap & trace devices (PRTT), geo-location data, vehicle GPS data, and stationary video

9

surveillance; controlled drug debt repayments; arrests of co-conspirators[3] and data extraction from search warrants on DTO members phones; and court-authorized T-III interception of wire and electronic communication over WIGGINS' phones.

16. Through court-authorized monitoring of PRTT data of WIGGINS' identified phones, investigators have learned that during the overnight hours the device or handset assigned to WIGGINS' phone is consistently in the area of the SUBJECT PREMISES, indicating that this is WIGGINS' primary residence.

17. Through continued physical and court authorized electronic surveillance, investigating agents determined that WIGGINS was spending the overnight hours at the SUBJECT PREMISES and frequenting 1105 Carolina Pines Avenue, Raleigh, NC ("1105 Carolina Pines"), almost every morning or afternoon, where individuals would arrive and meet with WIGGINS. Investigators believe, based on intelligence throughout this investigation, that 1105 Carolina Pines is WIGGINS' primary distribution location for illegal drugs.

### *CHS-3 Information of WIGGINS*

18. In late October 2023, officers with RPD's Gang Suppression Unit took CHS-3 into custody for an active arrest warrant for sell and deliver cocaine. During the arrest, a firearm and approximately 225 grams of cocaine were seized that field-

---

[3] On September 28, 2023, investigating agents observed Antonio HALL ("HALL") meet with WIGGINS, inside 1105 Carolina Pines. HALL was observed exiting with a bag, which he placed in the trunk of his vehicle. HALL was ultimately stopped by uniformed RPD officers, who, during a probable cause search of HALL's vehicle, located approximately 8 ounces of marijuana in a bag in the trunk. HALL was subsequently arrested for Possession with Intent to Sell and Deliver Marijuana, under NCGS 90-95.

Case 1:24-mj-00003-LPA   Document 1   Filed 01/05/24   Page 11 of 31

tested positive for cocaine. After waiving *Miranda* rights, CHS-3 provided an unprotected statement to investigating agents. A subsequent search warrant, executed at CHS-3's residence, resulted in the seizure of an additional 1,275 grams of cocaine that field-tested positive for cocaine.

19. CHS-3[4] advised that they had been purchasing cocaine directly and consistently from WIGGINS since 2018. WIGGINS initially fronted[5] CHS-3 nine ounces of cocaine in 2018, and subsequently CHS-3 would buy approximately nine ounces of cocaine from WIGGINS every other week for the next 60 weeks.

20. CHS-3 stated that on October 19, 2023, WIGGINS fronted CHS-3 a kilogram of cocaine. CHS-3 stated this transaction, and most of the recent transactions with WIGGINS, occurred at 1105 Carolina Pines Avenue. This information was corroborated by electronic surveillance of WIGGINS' telephone and pole camera footage which showed CHS-3 arriving at and leaving 1105 Carolina Pines Avenue on October 19, 2023.

21. CHS-3 stated that they knew WIGGINS to operate at least four vehicles: a two-door Honda Accord (SUBJECT VEHICLE 1), a Kia SUV (SUBJECT VEHICLE 2), a 2016 black Mercedes-Benz S550 (SUBJECT VEHICLE 3), and a Mercedes-Benz SUV (SUBJECT VEHICLE 4).

---

[4] CHS-3 cooperated in consideration for anticipated future charges. The information and cooperation provided by CHS-3 is considered to be reliable and accurate. Subsequently, during the investigation, agents learned that CHS-3 continued to be involved in drug distribution and their status as a cooperator was terminated.

[5] "Fronted" is a slang term used in drug distribution where the supplier provides illegal drugs to the customer on consignment, with the expectation of future partial or full payment.

11

22. CHS-3 stated that WIGGINS is known to always have a firearm near him. CHS-3 advised that they have observed WIGGINS with a firearm while at 1105 Carolina Pines Avenue while selling cocaine in the past. CHS-3 stated that WIGGINS keeps a firearm nearby to protect himself from being robbed of his proceeds and his product.

23. CHS-3 stated that they owed WIGGINS $21,500.00 USD for the kilogram of cocaine fronted on October 19, 2023, by WIGGINS. This information is corroborated by the approximate 1,275 grams of cocaine seized from CHS-3's residence, following their arrest.

### *CHS-3 Contact with WIGGINS and Controlled Payments of Drug Debt*

24. Beginning on October 27, 2023, investigating agents utilized CHS-3 to conduct three separate controlled payments to WIGGINS for the drug debt. The amount paid to WIGGINS, totaling $21,500, was to settle the outstanding debt for the kilogram of cocaine fronted to CHS-3 on October 19, 2023.

25. Prior to each of these controlled payments, CHS-3 was equipped with audio/video recording device(s) and provided with a specified amount of pre-recorded United States currency to complete each transaction. To ensure the integrity of the controlled payments and this investigation, a search of CHS-3 and the vehicle used by CHS-3 were conducted before and after each controlled payment. No contraband or controlled substances were located during any of those respective searches.

26. All three controlled payments, occurring on October 27, 2023, November 1, 2023, and November 8, 2023, took place with WIGGINS inside 1105 Carolina Pines

12

Avenue. The coordination of these meetings and controlled payments all involved wire and/or electronic communication between CHS-3 and WIGGINS over TT1.

27.     During the second controlled payment, occurring on November 1, 2023, a court authorized pole camera showed Jonathan PULLEY ("PULLEY") arrive at 1105 Carolina Pines approximately eight minutes before CHS-3. Once inside the basement of 1105 Carolina Pines, A/V recording equipment, in the possession of CHS-3, captured conversation between WIGGINS and PULLEY. The conversation between WIGGINS and PULLEY contained dialogue, in pertinent part, as follows:

PULLEY: I'm about to Cash App you, what is it, 120 for the uhhh zip?

WIGGINS: Yeah

PULLEY: [UI] 100 pills

WIGGINS: 100 pills?

PULLEY: Yeah, I'm about to Cash App you 245. Right?

WIGGINS: Yeah

Your affiant knows through my training and experience that the above captured dialogue between WIGGINS and PULLEY is consistent language used during drug transactions. Additionally, CHS-3 confirmed that PULLEY was interacting with WIGGINS, during the second controlled payment, inside the 1105 Carolina Pines, to purchase MDMA pills.

28.     Physical and electronic surveillance, toll analysis, information from CHS-3, and review of the audio/video recordings confirmed that WIGGINS was the individual who accepted the controlled payments of prior drug debt from CHS-3 on

13

October 27, 2023, November 1, 2023, and November 8, 2023, inside 1105 Carolina Pines Avenue.

*Interception of Wire and Electronic Communication of WIGGINS over TT1*

29. On November 17, 2023, the Honorable James C. Dever III, United States District Court Judge of the Eastern District of North Carolina, authorized the intercept of wire and electronic communication of WIGGINS over TT1 (Ref: 5:23-MJ-2376-D).

30. During the initial morning of authorized interception of wire and electronic communication over TT1, investigating agents determined that WIGGINS and his wife, SHEILA, at times, discussed criminal conduct. This was first made evident during an intercepted wire communication, placed by WIGGINS on November 18, 2023, at 10:50 am to SHEILA. During that call, WIGGINS and SHEILA discussed the arrest of CHS-3 and WIGGINS' suspicion that CHS-3 may be cooperating with law enforcement.

31. The following morning, on November 19, 2023, at 10:25 AM, a telephone call was placed by WIGGINS over TT1 to SHEILA. The following is a transcription of a pertinent portion of their initial conversation:

SHEILA: Hello.

WIGGINS: What's up, baby? You alright?

SHEILA: Yes.

WIGGINS: [UI] I was just leaving the house. I got turned around cause I want make sure [UI]. Sometime that damn [UI] the door be locked but my thing say

14

like its unlocked, so I'm just double checking. And I did that with my hand, but still I don't like for it to be saying like it's unlocked.

SHEILA: Yeah. [UI]. Okay. I understand what you're saying.

WIGGINS: [UI] Yeah.

[Laughter]

SHEILA: Shit.

[Talking over one another]

WIGGINS: Can't go out like that.

SHEILA: Uh huh. Too much invested there.

WIGGINS: [Laughs]

[Talking over one another]

WIGGINS: I don't give a fuck if I was in, in, in VA right now. I'd turn around... Shit.

SHEILA: Right. Look, you got to. [laughter]

WIGGINS: Got to.

SHEILA: Uh huh. Got to, babe.

Based on your affiant's training and experience, the underlying investigation, and court authorized Geo Location data from WIGGINS' telephone, this conversation, between WIGGINS and SHEILA is believed to relate to ensuring the SUBJECT PREMISES is locked. During their conversation, SHEILA responds to WIGGINS saying that there is, "too much invested there," indicating that she has personal knowledge of the value of what is stored at the SUBJECT PREMISES. WIGGINS

15

responds and emphasizes how important it is for the SUBJECT PREMISES to be locked, stating that he would have turned around even if he was further away in Virginia.

32.     On December 1, 2023, at approximately 9:00 am, WIGGINS received information over TT1 about the arrest of his drug associate the day prior. After receiving this information, electronic surveillance showed WIGGINS depart from the SUBJECT PREMISES and travel to the area of a "Boost Mobile" store in east Raleigh. Within ten minutes of his arrival, WIGGINS, using TT1, contacted #611, a customer service number for T-MOBILE. After the completion of this call, TT1 appeared to no longer be in service or use.

33.     Through continued toll analysis, investigating agents determined that on or about December 1, 2023, WIGGINS began to actively use 941-760-2441, TT2 as a replacement for TT1.

*Interception of Wire and Electronic Communication of WIGGINS over TT2*

34.     On December 14, 2023, the Honorable James C. Dever III, United States District Court Judge of the Eastern District of North Carolina, authorized the intercept of wire and electronic communication of WIGGINS over TT2 and an additional phone number used by WIGGINS, TT3 (5:23-MJ-2465-D). Interceptions pursuant to this order are ongoing.

35.     Through physical and electronic surveillance, coupled with T-III interceptions, agents have established a pattern of life for WIGGINS. WIGGINS spends his overnight hours at the SUBJECT PREMISES. Most days, WIGGINS

16

departs the SUBJECT PREMISES before noon in one of the four SUBJECT VEHICLES and returns home to the SUBJECT PREMISES in the early evening hours. Generally, WIGGINS spends a significant amount of time during the day at the 1105 Carolina Pines address, engaging in drug deals or directing others to distribute controlled substances.

36. For example, On December 19, 2023, pursuant to the authorized interception of wire and electronic communication over TT2, WIGGINS placed an outgoing call at 5:14 PM to PULLEY. The following is a transcribed portion of their pertinent conversation:

WIGGINS: Check this out. I might need you to do something for me right. Cause my man, he trying to come around. I'm not around and shit, you know I'm in Durham but uh... he-he-he need it, he need it and shit right?

PULLEY: Yeah.

WIGGINS: You know what I'm saying? He need it. So what I'm going to do right, whatever you can handle, he's going to need, he gonna need a half, then I just give it back to you as one. You see what I'm saying?

PULLEY: I get half?

WIGGINS: Yeah, yeah. You give him the half.

PULLEY: Uh, soft or hard?

WIGGINS: He probably want soft, soft shit. You know what I'm saying? Sometime he be wanting half and half, but majority of the time he want just regular soft. You know what I'm saying? And I'll give it back to you. What,

17

he owe me like 285? So, he going to give you that 285. You give him nothing, cause I'm going to give you this joint back tomorrow.

PULLEY: Alright.

WIGGINS: Alright.

PULLEY: What, what, what, what?

WIGGINS: I'm a uh... You want me to give him your math and tell him to call you?

PULLEY: Yeah, give him my number.

WIGGINS: Alright, alright, alright.

Investigating agents know the terms "hard" and "soft" to refer to cocaine base and powder cocaine, respectively. Considering these facts and the context of the conversation, investigating agents believe, through their training, experience, and knowledge of this investigation, that WIGGINS requested PULLEY to provide a third party with a half-ounce of cocaine, likely in powder form, and that PULLEY, in-turn, would receive a half-ounce of cocaine from WIGGINS for his assistance.

37.    After this call, on December 19, 2023, pole camera footage showed PULLEY arrive at 1105 Carolina Pines at approximately 5:51 PM. At approximately 5:59 PM, the third party arrived by vehicle. PULLEY exited his vehicle and made brief contact with the third party, before accessing 1105 Carolina Pines. Minutes later, PULLEY exited the residence and contacted the third party, who was waiting in their vehicle. After a brief interaction through the driver's side window, the third party departed, and PULLEY walked back towards the front door of 1105 Carolina

18

Pines. This observed interaction, coupled with the intercepted wire communication over TT2 between WIGGINS and PULLEY, led investigating agents to believe that PULLEY entered 1105 Carolina Pines to retrieve a half-ounce of cocaine, which he then provided to the third party, as directed by WIGGINS.

38. Investigating agents have determined through physical and court authorized electronic surveillance of all four SUBJECT VEHICLES, and the T-III interception of WIGGINS' phones, that WIGGINS primarily uses these vehicles as transportation for the purpose of distributing controlled substances. The following are recent examples of WIGGINS using the SUBJECT VEHICLES in this way:

a.) On the morning of December 23, 2023, WIGGINS drove SUBJECT VEHICLE 1 to 1105 Carolina Pines. While there, WIGGINS fielded phone calls pertaining to drug distribution, met with individuals consistent with these drug calls, and he later departed in SUBJECT VEHICLE 1 and returned to the SUBJECT PREMISES.

b.) On the morning of December 20, 2023, WIGGINS drove SUBJECT VEHICLE 2 from the SUBJECT PREMISES and later arrived at 1105 Carolina Pines Avenue. While there, WIGGINS fielded phone calls pertaining to drug distribution, met with individuals consistent with these drug calls, and departed in SUBJECT VEHICLE 2 to deliver drugs to an associate, consistent with an intercepted call. WIGGINS later returned to the SUBJECT PREMISES in SUBJECT VEHICLE 2.

19

c.) On the morning of December 28, 2023, WIGGINS drove SUBJECT VEHICLE 3 to 1105 Carolinas Pine Avenue. While there, WIGGINS fielded phone calls pertaining to drug distribution, met with individuals consistent with these drug calls, engaged in brief interactions with individuals consistent with drug transactions, and then returned to the SUBJECT PREMISES in SUBJECT VEHICLE 3 later that day.

d.) On the afternoon of December 8, 2023, WIGGINS arrived at 1105 Carolina Pines Avenue in SUBJECT VEHICLE 4. While there, WIGGINS engaged in repeated and brief interactions with several individuals. Based on the underlying investigation, coupled with my training and experience, I believe these interactions were related to the distribution of controlled substances. WIGGINS later departed in SUBJECT VEHICLE 4 and returned to the SUBJECT PREMISES.

39.    Since the initial authorized interception of WIGGINS over TT1 on November 17, 2023, investigating agents have not observed WIGGINS engage in any sort of legitimate employment.    Instead, based on T-III interceptions and contemporaneous surveillance, WIGGINS' daily activity is coordinating and meeting with drug associates and providing, or directing others, to provide controlled substances.

20

## CONCLUSION

40.     Based on my training, experience and the facts set forth in this affidavit, it is my belief that WIGGINS is actively involved in the TARGET OFFENSES and there is probable cause that evidence of these crimes are presently located at and/or in the SUBJECT PREMISES, SUBJECT GARAGE, and SUBJECT VEHICLES as described in **Attachments A-1, A-2, A-3, A-4, A-5, and A-6,** and that there is probable cause to seize items of evidence as further described in **Attachment B**.


/s/ Jonathan S. McCann
Jonathan S. McCann
Task Force Officer
Federal Bureau of Investigation


On this ____ day of January 2024, pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of the written affidavit.


Hon. L. Patrick Auld
United States Magistrate Judge
Middle District of North Carolina

21

# ATTACHMENT A-1

## DESCRIPTION OF RESIDENCE TO BE SEARCHED

4511 Langdon Drive, Apartment 203, Morrisville, North Carolina, 27560

The SUBJECT PREMISES is an apartment located at 4511 Langdon Drive, Morrisville, North Carolina, a three-story residential apartment building. SUBJECT PREMISES is located within Durham County, in the Middle District of North Carolina, and includes an exterior storage shed/closet, rented exterior garage(s) or any other place within the confines of the apartment that can reasonably be used to store illegal contraband or evidence. The numbers "4511" are posted in dark lettering over a white placard on the north side of the building's east breezeway. The SUBJECT PREMISES, apartment "203," is located on the second floor, in the southeast corner of the building, and accessible by stairwell from either the north or south side of the building's east breezeway. The numbers "203" area posted in white lettering over a dark placard to the left of the front door of the SUBJECT PREMISES.



4511 Langdon Drive, Morrisville, North Carolina 27560 – Apartment 203 in rectangle (November 20, 2023)



Northside of east breezeway of building 4511



Apartment 203 & Magnified image of unit number

22

## ATTACHMENT A-2

## DESCRIPTION OF GARAGE TO BE SEARCHED

4573 Langdon Drive, Unit C, Morrisville, North Carolina, 27560

The SUBJECT GARAGE is single car garage, located at 4573 Langdon Drive, an outbuilding at an apartment complex in Durham County, North Carolina, in the Middle District of North Carolina. The number "4573" is posted dark colored lettering over a white placard over a single solid white door. The garage to be searched, unit "C," is located in the center of the outbuilding, labeled as 4573. The letter "C" is posted, by a white over dark colored placard, directly over the garage door. The SUBJECT GARAGE is located less than 500 feet, north of the SUBJECT PREMISES, described in Attachment A-1.



4573 Langdon Dr. Morrisville, NC 27560 (in rectangle) – Google Earth



4573 Langdon Dr. Morrisville, NC 27560 – Unit C in center - Google Streetview 2018



Unit "C" of building 4573 – December 27, 2023

23

## ATTACHMENT A-3

## DESCRIPTION OF VEHICLE TO BE SEARCHED

2011 Honda Accord

2-door sedan,

Silver in color w/ black rims

VIN# 1HGCS2B85BA000709

North Carolina Registration Number Plate of RET6873



Actual Vehicle

Case 1:24-mj-00003-LPA   Document 1   Filed 01/05/24   Page 25 of 31

**ATTACHMENT A-4**

**DESCRIPTION OF VEHICLE TO BE SEARCHED**

2013 Kia Sorento

4-door compact sport utility vehicle,

black in color

VIN# 5XYKW4A23DG393958

North Carolina Registration Number Plate of HJL1547



Actual vehicle

25

## ATTACHMENT A-5

## <u>DESCRIPTION OF VEHICLE TO BE SEARCHED</u>

2016 Mercedes-Benz S550

4-door sedan, black in color

VIN# WDDUG8CB7GA221405

North Carolina Registration Number Plate of KFX5908



Actual Vehicle

26

**ATTACHMENT A-6**

## DESCRIPTION OF VEHICLE TO BE SEARCHED

2020 Mercedes-Benz GLE 350

4-door sport utility vehicle, black in color

VIN# 4JGFB4KB6LA055718

North Carolina Registration Number Plate of KKY1033



Actual Vehicle

27

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEARCHED FOR AND/OR SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 21, United States Code, Section 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), Title 18, United States Code, Section 922(g) (Possession of a Firearm by a Convicted Felon), and Title 18, United States Code, Section 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime):

1. Logbooks, records, payment receipts, notes, and/or customer lists, ledgers, shipping labels and other papers and property relating to the transportation, ordering, purchasing, processing, storage and distribution of controlled substances, including but not limited to cocaine, including all records of income and expenses.

2. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and other items relating to travel to obtain and distribute narcotics and narcotics proceeds. Evidence of such travel is often times maintained by narcotics traffickers in the form of airline receipts, bus tickets, automobile rental receipts, credit card receipts, travel schedules, diaries, day planners, hotel receipts, logs, travel agency vouchers, notes, cellular telephone tolls and records of long-distance telephone calls.

3.      Books, records, invoices, receipts, auto titles, financial statements, bank statements, cancelled checks, deposit tickets, passbooks, money drafts, withdrawal slips, certificates of deposit, letters of credit, loan and mortgage records, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, wire transfer applications and/or receipts, fictitious identification, and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money.

4.      Electronic equipment and their contents, utilized to contact co-conspirators and/or containing information related to the transportation, ordering, purchasing, processing, storage and distribution of controlled substances, and the proceeds therefrom, including but not limited to pagers (digital display beepers), telephone answering machines, electronic data organizers, telephone caller identification boxes, video and audiocassette tapes, and any stored electronic communications contained therein.

5.      Cellular telephone(s) and/or portable cellular telephone(s) and any stored electronic communications contained therein referencing and relating to the distribution or possession of controlled substances or other communications and information as outlined in Attachment B.

6.      United States currency, precious metals, jewelry, gold coins, and financial instruments, including, but not limited to, stocks and bonds.

7.    Photographs of assets and/or narcotics, including still photos, negatives, videotapes, films, slides, undeveloped film, and the contents therein.

8.    Address and/or telephone books, rolodex indices, and any papers reflecting names, addresses, telephone numbers, pager numbers, and fax numbers of co-conspirators, sources of supply, storage facilities, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

9.    Indicia of occupancy, residency, rental and/or ownership of the premises described above or vehicles located thereon, including, but not limited to, utility and telephone bills, cancelled envelopes, keys, deeds, purchase lease agreements, land contracts, titles and vehicle registrations.

10.    The opening, search and removal, if necessary, of any safe or locked receptacle or compartment, as some or all of the property heretofore may be maintained.

11.    Drug paraphernalia and equipment, related to the sale, manufacture, processing and storage of controlled substances, including but not limited to all cooking equipment, chemicals, packaging materials, scales, presses, and cut.

12.    All firearms and ammunition and documents related to purchase, sale, ownership, or possession.

13.    Controlled substances including but not limited to cocaine, cocaine base, marijuana and MDMA.

30